Yeatts v. Zimmer Biomet Holdings, Inc. Mr. Enzina. Thank you, Your Honor. Good morning. Good morning. I may please the Court. I am Paul Enzina, and I represent the appellant in this case, Alex Yeatts. In 2007, Biomet learned that the U.S. Department of Justice and the SEC were investigating its compliance with the Foreign Corrupt Practices Act. Biomet sells medical devices around the world, and Biomet had violated the FCPA in numerous countries. So Biomet knew that the best outcome from this investigation, from its standpoint, would be to negotiate a deferred prosecution agreement with the DOJ in order to avoid a criminal conviction and minimize the penalty. They knew that in order to achieve that result, they would be required to sever ties with the individuals and entities who were responsible for breaking the law. Now, one of the countries in which Biomet had been violating the FCPA was Brazil, where Biomet sold its products through a distributor known as Procentis. And Biomet had known for several years that Procentis was making payments in violation of the FCPA. So Biomet sent Procentis a letter and said, we are terminating our relationship with you. But Procentis responded by saying, well, if you do that, you cannot sell your products at all in Brazil because we hold the necessary government registrations. So Biomet faced a conundrum, which was they could cut ties with Procentis and negotiate their DPA, but that would require them to stop selling in Brazil and lose that revenue for a period of several years while they got their own registrations. But they didn't want to do that. They wanted to do both. So what they did was they created a new distribution scheme whereby the Procentis would spin out some corporations to employees of Procentis and partners and other confederates who would have these new corporations, which would be the ostensible distributors. And they would use Procentis's registrations. Up to this point, Mr. Yates had nothing to do with any of this. He was in Argentina managing Biomet's operations there. But he had been instrumental in- Only there? I thought he was the South American manager. No, in 2009, he was changed from being the managing director of Argentina to being in charge of all of South America. And the reason for that was that he was instrumental in reporting and stopping FCPA violations in Argentina. And Biomet knew that putting him in charge of South America would add credibility to their arguments to DOJ that they were complying with the law. So they brought him in, but they were walking a fine line between wanting DOJ to believe they had severed ties with Procentis, but having to do business with Procentis. In fact, they signed a new contract with Procentis and paid them millions of dollars to continue to be involved in Biomet's operations. So they brought Mr. Yates in and told him to deal with this. And they gave him instructions. And there's a hot dispute over what the content of those instructions were and whether or not Mr. Yates followed them. And part of the dispute exists because there was no writing. Despite the importance of this issue, they didn't put it in writing. So they brought Mr. Yates in, and for three years, he followed those instructions, which included dealing with Procentis. In 2012, however, Biomet completed negotiations for their deferred prosecution agreement in which they represented that they had terminated Procentis. They did not reveal in the deferred prosecution agreement that although they had terminated their prior relationship with Procentis, they had simply entered into a new and different relationship with Procentis. In 2013, a whistleblower told Biomet that they would go to DOJ and tell them this. So Biomet knew it had to negotiate a new deferred prosecution agreement. And they told DOJ that the reason they had continued to do business with Procentis was because Mr. Yates had ignored a company-wide requirement to cease all business with Procentis. Now, that was clearly not accurate because Biomet had entered into a new contract with Procentis, which required Procentis to continue to play a role. But that's what they said in the deferred prosecution agreement. So the DOJ, a monitor was appointed pursuant to the DPA, and the monitor said, well, who is responsible for this? Biomet said, here are the people, including Alex Yates. And the monitor said, send out a restricted parties list and include his name on it, which they did. And that is what brings us here today. Biomet published on numerous occasions a statement saying that they had conducted a, quote, unquote, corruption-related investigation in Brazil. As a result of that investigation, Mr. Yates had been suspended, and Biomet had determined that he was a, quote, to comply with anti-corruption law. The district court held, as a matter of law, that this was not defamatory because, the district court said, the notion that he was a compliance risk is an opinion that cannot be proven false. Now, it is clear from Milkovich, the Supreme Court case, that there is no exception to defamation for opinion. As the court said in Milkovich, the dispositive question is whether a reasonable fact finder could conclude that the statement implies facts which can be proved true or false. Now, Biomet itself said that the reason Mr. Yates was on this list was, quote, because of the committee's determination that he had been involved in corruption-related activity in Brazil, end quote. That's at the joint appendix, page 231. So, the company was clearly saying, not simply that they had determined that Mr. Yates was at risk, but that it had made that determination by conducting an investigation which revealed misconduct by Mr. Yates that resulted in his suspension. Biomet concedes as much. At its brief at page 23, Biomet says, a reader might surmise that the statement was based on factual knowledge of misconduct. However, they said it's not defamatory under Milkovich because it doesn't convey a provably false factual connotation on its face. Now, with all due respect, that is simply a blatant misreading of Milkovich. Biomet argues in its brief that Milkovich rejected the theory that defamation can be shown by disproving implied facts. And Biomet says, the provably false connotation test of Milkovich makes allegedly implied statements irrelevant. Now, as I said, that is simply a flat-out misreading of Milkovich, and I don't think it's a fair reading of Milkovich. Milkovich clearly says that the dispositive question is whether a reasonable fact-finder could conclude from the quote-unquote opinion that it was based on facts that could be proven true or false. And the district court found that this statement did exactly that. In ruling on the motion to dismiss, the district court said a reasonable recipient of the email would connect Yates to Biomet's criminal activities, especially if they were aware of the investigation, the deferred prosecution agreement, and the penalty. And in ruling on the motion for summary judgment, the district court said the fact that he was suspended suggests that he engaged in misconduct. And the fact that he is termed a significant and unacceptable risk suggests his participation in criminal activity. So, your honors, that finding alone is sufficient to make summary judgment improper in this case. Now, the district court also ruled that it granted summary judgment on the issue of malice, holding that the statement was protected by the privileges of the common interest and public interest privileges. Now, those privileges, to be applicable, first require that Biomet prove that the statements were made in good faith. And those privileges may also be overcome by Mr. Yates upon proof that Biomet acted with ill will or made them without grounds for belief in their truth. And as the court held in Williams v. Tharp and as the district court here said, that means the privilege doesn't apply if the statement was obviously not correct. And Biomet knew at the time it told the monitor that Mr. Yates had ignored a prohibition on any business with Mr. Percentise, that that statement was not true. So that could not have been made in good faith. Now, the district court said even a dispute over whether Biomet knew that that was true or not cannot overcome the power of the monitor to motivate Biomet to act in any way, including publication of the RPL, making such disputes immaterial. Now, Your Honors, what that means, in effect, is that even if Biomet knew that what it was saying was false, and even if Biomet lied to the monitor and told the monitor something that it knew wasn't false, the fact that the monitor then told Biomet to publish that statement absolves Biomet from its bad faith in publishing it. And that's simply not the law, and it can't be the law. And with the court's permission, unless there are any questions, I'd like to reserve my time for rebuttal. Thank you, Mr. Zimmer. Ms. Harrington. Good morning. My name is Beth Harrington on behalf of Appley Zimmer Biomet. May it please the court. Mr. Yates is unhappy about being placed on a restricted parties list that an independent monitor required Zimmer Biomet to distribute to its employees and its business partners in conjunction with a deferred prosecution agreement. In Mr. Yates' opinion, he does not belong on that list. This RPL identified Mr. Yates and several other people and entities that Zimmer Biomet considered to be compliance risks to the company. Both Zimmer Biomet and then later the United States government disagree with Mr. Yates' opinion that he is not a compliance risk. The undisputed facts in this case, however, demonstrate that he does not have a defamation claim. The district court decided correctly as a matter of law that Mr. Yates could not establish the elements of either a defamatory statement or malice for his claims. Mr. Yates, as Judge Easterbrook pointed out, was the senior most executive in Latin America. He had oversight for Latin America. He was a Wharton graduate and had received no less than 10 FCPA trainings. He was responsible for FCPA compliance in South America. Before the court, the undisputed facts showed that Mr. Yates was aware that Sergio Galindo had committed unlawful actions of bribing doctors as of May 2008. After May 2008, Galindo and his distributor were terminated. And they were prohibited directly or indirectly from importing, storing, promoting, distributing, or in any way marketing Biomet products. And that was reflected in a June 2009 agreement. As of the June 2009 agreement, Galindo's only involvement with Biomet was to be able to work with licensing on product registrations. Yates, on the very least, knowingly continued to transact business with Galindo well beyond the scope of product registrations and well after he knew that Galindo had bribed doctors. The United States government, in its own independent investigation, found that Mr. Yates's actions were in violation of the FCPA and improper. They were in violation of what? In the internal controls of the FCPA. Of what? If you would use real words rather than initialisms, that would help us generalists. I'm sorry. I'm sorry. In the end, the FCPA, the Federal Corrections Act. Yes, use real words, please. I will. Thank you, Your Honor. The record shows, however, that Mr. Yates's actions were at the center of the 2017 Deferred Prosecution Agreement Statement of Facts that the government gave to Zimmer Biomet and ultimately Zimmer Biomet agreed to. In the 2017 DPA, or Deferred Prosecution Agreement, Zimmer Biomet paid a monetary penalty of $17.4 million to resolve the criminal charges brought against it by DOJ. I'd like to start first with the qualified privilege. If you would use real words, that would help. Yes. I think you mean the Department of Justice. Yes, Your Honor. But I'm not sure. Yes, Your Honor. I apologize. Yes. Zimmer Biomet paid a monetary penalty of $17 million to resolve the criminal charges brought by the Department of Justice. Probably brought by the United States. Yes, the United States. Yes, Your Honor. I'd like to turn to the qualified privilege, please. Yates's defamation claim fails because the restricted party list publication is protected by the doctrine of both the qualified privilege of common interest and the qualified privilege of public interest. Both privileges negate malice, a required element of the defamation claim. The qualified privilege of common interest applies to communications made in good faith on any subject matter in which the party making the communication has an interest or legal, moral, or social duty, and if made to a person, having a corresponding interest or duty. It is, under the case law, applied to a wide range of relationships, including between employees and employers, as well as business partners. There are numerous reasons why the common interest privilege applies in this scenario, in this case. Zimmer Biomet's statements concerning Mr. Yates, as made in the restricted parties list, was made pursuant to regulatory obligations imposed by Zimmer Biomet by the monitor and enforced by the Department of Justice. The statement was informed by Mr. Yates' admitted contacts with Mr. Equilindo concerning the distribution of Biomet products. Distribution of the statement was made on a limited basis to only employees, subsidiaries, and company partners for the limited purpose of reducing risk of future Federal Corrupt Foreign Practices Act violations. Zimmer Biomet and all recipients of the restricted parties list had a legal and moral duty to observe regulatory compliance and avoid corruption in the future. For similar reasons, the district court correctly determined that the restricted parties list was protected by the qualified privilege of public interest because it was made at the behest of enforcement to avoid corruption-related behavior. Again, Zimmer Biomet has a legal duty to comply with the law and take precautions to prevent further violations. The undisputed evidence in the record shows that the monitor appointed would not have approved the restricted parties list if Mr. Yates' name had not been placed on it. A company needs to be able to communicate with its business partners to avoid violating the law without fear of being sued for communications. Failure to permit the qualified privilege in this case, in this context, could open the floodgates of litigation to any and all entities that find themselves on a restricted parties list and who believe that they may escape regulatory consequences by threatening litigation against a company that is making good faith efforts to take appropriately tailored steps to comply with its legal obligations. As Mr. Nzinna pointed out, after the privilege is established, then the burden shifts over to the defendant to determine whether the privilege has been abused. Here the district court found that it had not been abused. In order to show that, the defendant must show that the communicator was motivated by ill will in making the statement, there was excessive publication of the defamatory statements, and the statement was made without belief or grounds for belief in its truth. In this case, the defendant could not meet that burden and did not meet that burden. There is no evidence of ill will. On appeal, the defendant does not argue excessive publication, but grounds its arguments primarily without belief or grounds for belief. But the case law makes clear. The question is whether... The what makes clear? The case law. Thank you. The question is whether Zimmer Biomet had any grounds to believe that Mr. Yates was a compliance risk. The cases also reflect, even if that was mistaken belief, which it was not, that it is still protected by the common interest because there just needs to be a belief or grounds for belief. In this case, Mr. Yates' peripheral facts, the litigation of peripheral facts, cannot establish that Zimmer Biomet lacked belief in its statements. And therefore, both of these privileges should apply to the statements that were made in the restricted parties list. There's an even more fundamental reason that Mr. Yates' defamation claim fails in this case, and that is he's unable to adequately show a defamatory statement. In the restricted parties list, it's stated that Mr. Yates had been suspended in connection with a corruption-related investigation involving Biomet Brazil. That was a fact. That is a fact in his deposition that Mr. Yates says is true. He admits it's true. And that Biomet then had stated that it identified entities that pose a significant and unacceptable compliance risks. Mr. Yates admitted in his deposition that, in fact, that entire communication did not contain any false statements. And that he understood, in his deposition, he testified that he understood that Zimmer Biomet had the opinion that he was a compliance risk to the company. The restricted parties list, which describes Mr. Yates as a compliance risk, cannot serve as a basis for defamation, because Zimmer Biomet's view that Mr. Yates is a compliance risk cannot be proven false. For a statement to be actionable defamation, it must be clear that it conveys an objectively verifiable fact regarding the plaintiff. If the speaker is merely expressing a subjective view, interpretation, or theory, then the statement is not actionable. That Mr. Yates was a compliance risk was Zimmer Biomet's opinion in 2014, and it still is today. The company is still under a monitorship. There are no facts that Mr. Yates could prove before a jury now or at trial that would falsify Zimmer Biomet's assessment and opinion that he posed a clear compliance risk. In fact, the United States government and Zimmer Biomet both independently came to that conclusion. And the reason for that is that he was at the very epicenter of the conduct that led to the 2017 Deferred Prosecution Agreement. Twenty-two paragraphs of the statements of facts that were attached to the 2017 Deferred Prosecution Agreement addressed Mr. Yates's behavior. Mr. Yates seeks to avoid affirmance of the summary judgment on appeal, just as he did before the district court, by invoking a factual dispute for purposes of summary judgment. He argues disputes about whether he was solely responsible for risk to the company or whether actually his actions violated express company instructions. But the alleged affirmatory statement in this case does not state that Mr. Yates violated express instructions or that he was solely responsible for violations. Rather, the restricted parties list stated that Zimmer Biomet considered Yates to be a compliance risk. So stepping back, under the cases, this is similar to the court's decision of Sullivan v. Conway. There, the opinion was that Plinkton is a very poor lawyer. And the court found that that was not a defamatory statement because it could not be proven false, true or false, and that that was an opinion. Similarly here, that Mr. Yates is a compliance risk is similar to that statement because even if he could prove that he took no criminal actions, that proof would not resolve the question of whether he actually posed a risk. Although the record in the case shows that Mr. Yates was paid a hefty severance, Mr. Yates is unhappy about being on the list and that he was later terminated. But he has no grounds for a defamation claim. Mr. Galindo was terminated for bribing doctors. Mr. Yates admits knowingly continuing to do business with Mr. Galindo in a manner that exceeded the scope of the June 2009 agreement. The United States government, in its own independent investigation, found that Mr. Yates' actions were improper. Mr. Yates, in Zimmer Biomet's opinion, was the very definition of a compliance risk. And Zimmer Biomet complied with the directions of the independent monitor in placing him on the restricted parties list. As a matter of law, Mr. Yates simply does not have a defamation claim. And for that reason, we ask that summary judgment in Zimmer Biomet's favor on the defamation claim be affirmed. Thank you, Ms. Erickson. Thank you. Mr. Ensign. Ms. Harrington argued that there are no facts that could be proven that would prove that Biomet's opinion that Mr. Yates was a risk false. And that, I believe, is true. Because to say someone is a risk, particularly to say someone is a significant and unacceptable risk, obviously does convey an opinion. People have different views about risk. People have different views about what is significant and what's acceptable. The point, though, is what I didn't hear Ms. Harrington talk about, though, is the fact that the issue in this case is what else did the statement say? The statement didn't simply say Mr. Yates is a compliance risk. It didn't simply say he's a significant and unacceptable risk. It said we conducted an investigation, a corruption-related investigation. And as a result of that investigation, we suspended Mr. Yates. So right there it's saying Mr. Yates committed misconduct. Obviously, he would not have been suspended if he hadn't committed misconduct. And as a result of that investigation and that suspension, we have determined that he is a significant and unacceptable risk. So this is clearly implying facts that can be proven true or false, whether or not he engaged in any misconduct. And Ms. Harrington argued that the communication didn't contain any false statements. And it is true that Biomet conducted an investigation. It is true that Mr. Yates was suspended. And it is true that, well, it is Biomet's opinion that he is a compliance risk. The problem, though, is that what those statements imply is not true. And those statements clearly imply that we conducted an investigation and suspended him because he engaged in misconduct. And he did not engage in misconduct. That is the central factual dispute in this case. Ms. Harrington argued that the question is not whether he violated any instructions because he knew that Mr. Galindo and Procentis had bribed doctors. Well, yes, he did. And so did the company. And the company continued to do business with Mr. Galindo. And the company, through Mr. Yates Superior, the president of Biomet International, and through the company assigned in-house counsel, told him, this is how you can behave. This is what you can do with Mr. Galindo. And he followed those instructions to the letter. And what Biomet did then in the 2017 Deferred Prosecution Agreement, they didn't say, well, we told him he could only have this much involvement with Procentis, but he had too much involvement. They said, oh, we told him, don't have any involvement with Procentis. And he went ahead and did it anyway. And that's not true. And the reason they told DOJ that and didn't tell them what they're arguing now is because they wanted DOJ to believe that they had severed ties and that Mr. Yates had violated that. And that's not at all what happened here. Now, Ms. Harrington also said that the U.S. government found that Mr. Yates' acts violated the FCPA. That's not correct. Mr. Yates' acts did not violate the FCPA. The prohibition on dealing with Galindo was not a violation of the FCPA. The reason that was problematic was because Biomet had led the U.S. government to believe that it had cut ties with Galindo. And the violation that the U.S. government found was a violation by the company in its books and records. It was not Mr. Yates. The last thing I want to address is the privilege issues. Ms. Harrington spent a lot of time on the question of applicability of the privilege and about regulatory obligations and limited publication. None of that's an issue here. The issue here is did Biomet act in good faith? Did Biomet publish something that they did not have grounds to believe? And Ms. Harrington said, well, even if it's mistaken, it's okay. But it wasn't mistaken. It was knowingly false. Biomet told the monitor, look on page 13 of their brief, you'll see this. The monitor said, well, who's responsible for this? And Biomet appointed a committee. And they said, well, we're going to look at this and we're going to tell you who's responsible. And they said, why, it's Alejandro Yates because we told him not to have anything to do with Mr. Galindo and he went ahead and did it anyway. And that's not true. And now Biomet argues that not applying the privilege here could open the floodgates to anybody who wants to litigate this. But failing to examine it means that a company has free reign to throw an employee under the bus, even if falsely, and to defame him. Thank you, Your Honor. Thank you. Thanks to all counsel. The case is taken under advisement.